# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 92-KA-00973-SCT

*RODERICK FRANKLIN AND GLEN DALE JACKSON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/02/92 |
| TRIAL JUDGE: | HON. GRAY EVANS |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | STAN PERKINS |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: CHARLES MARIS, JR. |
| DISTRICT ATTORNEY: | FRANK CARLTON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND RENDERED - 6/20/96 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 7/11/96 |

**EN BANC.**

**PRATHER, PRESIDING JUSTICE, FOR THE COURT:**

¶1. This case involves the slaying of a 61-year-old homeless man, which occurred in a field behind the Frost Top Restaurant in Greenville, Mississippi on Sunday, January 19, 1992. In connection with this killing, 13-year-old Roderick Franklin and 17-year-old special education student Glen Dale Jackson were indicted in the Washington County Circuit Court for murder and conspiracy to commit murder. Franklin and Jackson were acquitted of the murder charges, but were convicted of the crime of conspiracy to commit murder. They were sentenced to twenty years in prison, with five years suspended. On appeal, Franklin and Jackson raise one issue:

> **WHETHER THE TRIAL COURT ERRED BY REFUSING THE APPELLANTS' REQUESTS FOR A DIRECTED VERDICT AND/OR JUDGMENT NOTWITHSTANDING THE VERDICT (JNOV)?**

¶2. On Sunday afternoon, January 19, 1992, Roderick Franklin, Glen Dale Jackson, and three other teenagers decided to "mess with" a homeless man. The five youngsters, threw rocks at the victim and kicked him for five to seven minutes. During this time, Michael Moering, a high school senior and the oldest boy in the group, left. Moering returned a few minutes later with a gun; he shot the victim.

Moering then pointed the gun at Franklin and another boy, because "he knew [they were] gon' to tell it." The subsequent autopsy revealed that the victim's death was caused by a gunshot wound to the back of his head.

## LEGAL ANALYSIS

### WHETHER THE TRIAL COURT ERRED BY REFUSING THE APPELLANTS' REQUESTS FOR A DIRECTED VERDICT AND/OR JUDGMENT NOTWITHSTANDING THE VERDICT (JNOV)?

¶3. Requests for a directed verdict and motions JNOV implicate the sufficiency of the evidence. The standard of review for the legal sufficiency of the evidence is well-settled:

> [W]e must, with respect to each element of the offense, consider all of the evidence--not just the evidence which supports the case for the prosecution--in the light most favorable to the verdict. The credible evidence which is consistent with the guilt must be accepted as true. The prosecution must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. Matters regarding the weight and credibility to be accorded the evidence are to be resolved by the jury. We may reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty.

*Wetz v. State*, 503 So.2d 803, 808 (Miss. 1987) (citations omitted).

¶4. The appellants argue that, although they may have conspired to commit assault, they did not conspire to commit murder. The law on conspiracy provides that:

> For there to be a conspiracy, "there must be recognition on the part of the conspirators that they are entering into a common plan and knowingly intend to further its common purpose." The conspiracy agreement need not be formal or express, but may be inferred from the circumstances, particularly by declarations, acts, and conduct of the alleged conspirators. Furthermore, the existence of a conspiracy, and a defendant's membership in it, may be proved entirely by circumstantial evidence.

*Nixon v. State*, 533 So. 2d 1078, 1092 (Miss. 1987) (citations omitted); *Mitchell v. State*, 572 So. 2d 865, 867 (Miss. 1990).

¶5. "'By its very nature, conspiracy is a joint or group offense requiring a concert of free will." *Flanagan v. State*, 605 So. 2d 753, 757 (Miss. 1992) (quoting *Moore v. State*, 290 So. 2d 603, 604 (Miss. 1974)). Furthermore, conspiracy requires the "union of the minds" of the conspirators. *Id.*

¶6. The only evidence of a conspiracy in this case is the fact that Franklin and Jackson went with the other boys to "mess with" the victim.[1] This is insufficient evidence of conspiracy to commit murder. *See Thomas v. State*, 591 So. 2d 837, 839 (Miss. 1991). There is no evidence to indicate that either Franklin or Jackson recognized that, by "messing with" the victim, he had entered into a common plan to commit murder or that he knowingly intended to further the common purpose of that plan. *See Johnson v. State*, 642 So. 2d 924, 928 (Miss. 1994). There is no evidence of a "union of the

minds" between the boy who pulled the trigger and the appellants. Accordingly, the judgment of conviction by the trial court is reversed and rendered in favor of the appellants. Roderick Franklin and Glen Dale Jackson are discharged on these charges of conspiracy to commit murder.

**¶7. REVERSED AND RENDERED. RODERICK FRANKLIN AND GLEN DALE JACKSON ARE DISCHARGED.**

**LEE, C.J., SULLIVAN, P.J., BANKS AND McRAE, JJ., CONCUR. SMITH, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY ROBERTS AND MILLS, JJ. MILLS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY ROBERTS AND SMITH, JJ. PITTMAN, J., NOT PARTICIPATING.**

**SMITH, JUSTICE, DISSENTING:**

*¶8.* On January 19, 1992, five teenagers in Greenville decided to go "mess with" Thomas Payton, an elderly homeless man, who lived in a vacant field behind the Frost Top Restaurant. Their messing with Payton consisted of throwing rocks, pieces of brick, and one large brick which struck the defenseless Payton, who immediately fell to the ground. Four of the teens continued the attack on Payton by stoning and kicking Payton while one of their number, Michael Moering, momentarily left the scene and returned with a gun. While Payton lay face down on the ground, Moering pointed the gun at the back of Payton's head and pulled the trigger, but the gun did not fire. Moering killed Payton on the second attempt with a shot to the back of the head. Eddie Jefferson, a State's witness, who had pled guilty to manslaughter, testified that he "had a feeling" and "knew in a certain way" that Moering was going to get a gun.

¶9. The majority, because of supposed lack of evidence of conspiracy, would reverse and render the conviction of these defendants by a Washington County jury and would set aside their sentence of twenty years imprisonment, with five years suspended. It is my view that the "messing with," as illustrated by the facts of this case, which unquestionably constituted a vicious, brutal, and sadistic assault upon an elderly, homeless and defenseless victim is a question properly left for the jury to determine the meaning and intent of these five teens in carrying out their ultimately fatal assault upon Payton. I therefore disagree and am compelled to dissent.

¶10. The majority maintains that there is no direct evidence of Franklin's and Jackson's intent to commit conspiracy to murder Payton. Direct evidence is not required. This Court, in ***Willis v. State***, 518 So. 2d 667, (Miss. 1988), in considering intent stated:

> [I]n addressing the question of wilful intent . . . this Court has said:
>
> Intent to do an act or commit a crime is also **a question of fact to be gleaned by the jury from the facts shown in each case**. The intent to commit a crime or to do an act by a free agent can be determined only by the act itself, surrounding circumstances, and expressions made by the act [sic] with reference to his intent. ***Shanklin v. State***, 290 So. 2d 625, 627 (Miss.

1974).

Too, criminal intent may be proved by **circumstantial evidence**. *Stinson v. State*, 375 So. 2d 235 (Miss. 1979). Intent may be determined from **the acts of the accused and his conduct and inferences of guilt may be fairly deducible from all the circumstances**. *Newburn v. State*, 205 So. 2d 260 (Miss. 1967). (emphasis added).

*Willis*, 518 So. 2d at 669 quoting *Shive v. State*, 507 So. 2d 898, 900 (Miss. 1987).

¶11. The majority's cited authority, *Nixon v. State*, 533 So. 2d 1078 (Miss. 1987), recognizes a defendant's membership in a conspiracy may be proven by entirely circumstantial evidence. In *Nixon*, citing *Gray v. State*, 487 So. 2d 1304, 1306 (Miss. 1986), this Court held "The conspiracy agreement need not be formal or express, but may be inferred from the circumstances, particularly by declarations, **acts, and conduct of the alleged conspirators**. **Furthermore, the existence of a conspiracy, and a defendant's membership in it, may be proved entirely by circumstantial evidence**." *Nixon*, 533 So. 2d at 1092.(citations omitted)(emphasis added).

¶12. The majority stakes its opinion squarely upon, "The only evidence of a conspiracy in this case is the fact that Franklin and Jackson went with the other boys to 'mess with' the victim." Majority opinion at 3. The majority finds the record lacking of any testimony by any of the conspirators that they intended and planned to kill Payton. In the process, the majority totally ignores this Court's pronouncements on this subject in *Gray, Nixon, Willis, Shanklin* and *Newburn*.

¶13. The majority accepts the defendant's argument that, although they may have conspired to commit assault, they did not conspire to commit murder, which was conceded by the defendants in their brief at page six. In doing so, the majority ignores the acts and conduct of the circumstances and the reasonable inferences of guilt which may be fairly deducible by the jury from such circumstances. In addition to the above mentioned facts in this record, Jefferson testified that it was Jackson who first suggested going "to mess with the old man." Jefferson also told the jury that he "had a feeling" and "knew in a certain way" that Moering was going to get a gun. And yet, the severe stoning and kicking of Payton continued to the point that Payton collapsed upon the ground.[2] And all four co-conspirators, having beaten Payton to a pulp, stood by and watched Moreing fail on his first attempt, then succeed on the second attempt in killing Payton with a shot to the back of his head. And no one did anything to prevent the killing. The term "messing with" as used by several of the co-conspirators, was a "declaration," as contemplated in *Nixon*, which along with their acts and conduct, would allow the jury to infer from the circumstances that indeed, a conspiracy to murder Payton did in fact exist. As in *Willis,* " intent is a question of fact to be gleaned by the jury from the facts shown in each case," and this was a proper question for the jury. *Willis*, 518 So. 2d at 669. Here, the declaration of "mess with" coupled with the defendant's acts and conduct, as demonstrated by the circumstances of the vicious beating, was more than sufficient for a reasonable jury to infer conspiracy and intent to kill Payton. I would affirm the conviction and sentence of Franklin and Jackson.

¶14. I respectfully dissent.

**ROBERTS AND MILLS, JJ., JOIN THIS OPINION.**

**MILLS, JUSTICE, DISSENTING:**

¶15. The majority today seeks to discharge into society Roderick Franklin and Glen Dale Jackson who, along with their companions, stoned, beat, kicked and shot to death Thomas Payton, an elderly homeless man in Greenville, Mississippi, on January 19, 1992.

¶16. The majority finds that since Franklin and Jackson only meant to stone, beat and kick the old man, that they should not be held responsible for his eventual death by gunshot wound from another actor in this sordid event. The only defense raised by the defendants herein was that they only meant to "mess with" the decedent and therefore should not be held responsible for his death. Apparently, we are asked to condone such acts of violence, even when they result in the ultimate death of the victim, when the defendants whine that they could not foresee the result of their violent acts.

¶17. Our citizens daily face constant threats of unrestrained violence, often furnished at the hands of juveniles. From the "wilding" escapades of our urban centers, to dropping children out of tall buildings, to "messing with" homeless people in Greenville, we endure conscienceless acts of random violence which cannot be tolerated in a civilized society. Today's holding emboldens the apologists who would defend these acts of violence upon the grounds that somehow society is at blame. Our failure to place responsibility squarely upon the shoulders of the criminals in this case only serves to further exacerbate the random killings, thuggery and apparently mindless attacks which have become so commonplace as to be practically accepted as a way of modern life.

¶18. The majority states "the appellants argue that, although they may have <u>conspired</u> to commit assault, they did not conspire to commit murder." (Emphasis added.) ***Majority Opinion***, p. 2. The majority then correctly cites ***Nixon v. State***, 533 So. 2d 1078, 1092 (Miss. 1987), which states that a conspiracy:

> . . . . must be recognition on the part of the conspirators that they are entering into a common plan and knowingly intend to further its common purpose. The conspiracy agreement need not be formal or expressed, but may be inferred from the circumstances, particularly by declarations, acts and conduct of the alleged conspirators. Furthermore, the existence of a conspiracy, and a defendant's membership in it, may be proved entirely by circumstantial evidence.

¶19. The present case actually shows that the young boys in question had earlier participated in harassing the old man, that they had taken a break from their endeavors, that they had gone to an accomplice's home and listened to a car radio for some period of time, and then had gone back to further harass the old man and "mess with" him. The defendants herein fully participated in all of the acts of kicking and stoning the old man. These acts may in fact have killed the old man. These young thugs then stood by and watched another conspirator pull the trigger on a pistol aimed at the old man's head. When the gun failed to fire, they took no efforts to intervene but stood by and watched him fire again, this time hitting the old man in the head. At what point in this chain of events do we find that the boys had stopped "messing with" the old man and had begun murdering him? These events are all interrelated and the actions of the young boys show such depravity and conscienceless disrespect for human life that the lower court jury was entitled absolutely to find them guilty of conspiring to commit murder. The argument raised by the defendants that they only intended to

"mess with" the victim is not a defense. It is only an excuse.

¶20. For the above reasons, I respectfully dissent from the majority opinion.

**ROBERTS AND SMITH, JJ., JOIN THIS OPINION.**

1. Although the prosecutor did argue the "street" meaning of the term "mess with" to the trial judge, there was no evidence before the jury on this matter.

2. The beating inflicted by the teens from the stoning and kicking of Payton was so vicious that initially police investigators erroneously assumed that to be the cause of death. They were totally unaware that the cause of death was due to a gunshot to the back of the head.